**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 1:24-CR-129 (LLA)** |
| **CHARLES TYLER HIMBER,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Charles Tyler Himber to eleven months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, the mandatory $100 special assessment, and a fine.

## I.    INTRODUCTION

The defendant, Charles Tyler Himber, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

On January 6, 2021, Himber trespassed over the Capitol grounds' restricted perimeter and made his way to the east side of the building. There, Himber joined in multiple pushes to get into the Capitol as police officers struggled—and failed—to contain the mass of rioters. Himber successfully broke into the building around 3:21 p.m., where police quickly subdued him and other rioters and escorted them out of the Capitol. But Himber did not leave the Capitol grounds. Rather, he defiantly climbed on a law enforcement vehicle and threatened an apparent journalist that "you're not fucking safe!" In subsequent interviews with the FBI, Himber lied about his conduct at the Capitol, first lying to claim that he never entered the building, then after being confronted with proof that he did, lying about what he did inside. Although he has pleaded guilty and accepted responsibility for his criminal conduct on January 6, he has yet to express any remorse, an entirely different thing.

The government recommends that the Court sentence Himber to eleven months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, the mandatory $100 special assessment, and a fine. This sentence reflects the gravity of Himber's conduct, but also acknowledges his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF No. 18, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3,

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

2020 presidential election.

**B.    Himber's Role in the January 6, 2021, Attack on the Capitol and His Subsequent Actions**

On January 6, Himber attended the "Stop the Steal" rally. He wore tan body armor, a black

jacket, an American flag scarf, and a green and gray hat.





*Image 1: Himber at the Stop the Steal rally*    *Image 2: Himber filming the Stop the Steal rally*

From the Stop the Steal rally, Himber traveled to the Capitol grounds, trespassing over the

restricted perimeter established by the U.S. Secret Service and Capitol Police.



*Image 3: Himber travels within the restricted area around the Capitol building*

Himber then made his way to the east side of the Capitol, where he tried to enter the building through the Rotunda Doors. An alarm rang as police pushed some rioters out of the building and others—including Himber—pushed to get in. At that moment, around 3:08 p.m., Himber joined with others in pushing rioters forward, who in turn pushed against the vastly outnumbered police officers seeking to keep from entering the Capitol. Himber and others tried to force their way inside. As shown in Image 4 below, Himber tried to push himself and rioters into the building. The effect was to briefly pin several officers against the side walls—a position of enormous danger—as the officers struggled to close the doors again. As seen from the video in this moment, there was a gap between Himber and the rioters behind him. In other words, Himber was not pushed himself, and decided to engage in this civil disorder of his own volition.



*Image 4: Himber (circled in yellow) pushes other rioters against police officers (circled in red)*

Despite the attack on the officers, the rioters—including Himber—were unsuccessful, and the police were able to close the Rotunda Doors. At that point, Himber screamed, "Let us in!"



*Image 5: Himber screams "Let us in!"*

Around 3:21 p.m., some rioters were still inside the Rotunda Doors and others were outside trying to push their way in. Himber was part of a mob of rioters who forcefully pushed past and, by force of numbers, overwhelmed the police and entered the Capitol building.



*Image 6: Himber rushing into the Rotunda antechamber*

From there, Himber and his fellow rioters worked to push their way into the Rotunda itself. Another line of officers blocked their path, and Himber joined in the push against the line, until it too broke under the rioters' force.



*Image 7: Himber pushing into the Rotunda*

7

As the officers were pushed aside, Himber and the other rioters rushed into the Rotunda, though they were quickly surrounded by law enforcement personnel. Himber and his compatriots stopped trying to move further into the Capitol. Before leaving, however, Himber appeared to take part in a selfie photograph with several other rioters he had traveled with.



*Image 8: Himber taking a selfie in the Rotunda*

Police established control of the Rotunda anteroom and directed Himber and other rioters out of the building:


*Image 9: Himber leaving the Capitol*


*Image 10: Himber having left the Capitol*

Back outside the Capitol, Himber climbed onto a law enforcement vehicle. Before leaving the Capitol grounds, Himber yelled at an apparent journalist (another rioter claimed that "this guy works for CNN!") "you're not fucking safe!" Himber repeated the epithet as other rioters joined in, threatening the journalist as he left the area.


*Image 11: Himber climbs on top of a law enforcement vehicle*



*Image 12: Himber screams "you're not fucking safe!"*

Himber could be seen leaving the Capitol grounds with several associates as evening fell.

At some point that day, Himber posted a statement on Facebook, stating, "We're in" and

"Making history."



*Image 13: Himber's initial Facebook posts*

He later posted, "Storm in Capitol Hill is a go … drain the swamp manually ….

Evacuating Capitol Hill pushing back (flexed bicep emoji) (American flag emoji)."

10



*Image 14: Himber's subsequent Facebook post*

On May 12, 2021, FBI agents interviewed Himber, who said that he traveled to Washington, D.C. to attend the "Stop the Steal" rally. He claimed, however, that his statement on Facebook that "We're in" was made only when he heard that other attendees had entered the Capitol. He added that he did not enter the restricted area in or around the Capitol. This, as shown above, was a lie.

On August 31, 2023, FBI agents interviewed Himber at his home in Slidell, Louisiana. During the interview, Himber admitted to going to Washington D.C. on January 5, 2021, but initially denied entering the Capitol the next day. When shown a photograph of himself inside the Capitol building, however, Himber recanted and said that he entered the building but claimed, falsely, he had been pushed into the crowd and was only there for a second before being immediately escorted out of the building. As demonstrated by the government's evidence, this is not true: Himber joined with others in the crowd to push other rioters into police officers, working to breach the building and eventually enter the Rotunda itself. He also claimed to help police officers and civilians who had been injured, including a woman who had been stabbed. This was a lie.

## III.    THE CHARGES AND PLEA

On March 13, 2024, a federal grand jury returned an indictment charging Himber with civil disorder in violation of 18 U.S.C. § 231(a)(3) and four misdemeanors. On July 29, 2024, Himber

pleaded guilty to civil disorder pursuant to a guilty plea agreement.

## IV.    STATUTORY PENALTIES

Himber now faces sentencing for his violation of 18 U.S.C. § 231(a)(3). As noted in the Presentence Report, ECF No. 20 ("PSR"), Himber faces up to five years imprisonment, a fine of $250,000, and a supervised release term of up to three years. PSR at ¶ 4. In the plea agreement, Himber agreed to pay a special assessment of $100 and $2,000 in restitution. *Id.* at ¶¶ 4, 11.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). Here, the plea agreement the Probation Office have reached the same Sentencing Guidelines calculations regarding Himber's offense, to wit:

| U.S.S.G. § 2A2.4 | Base Offense Level | 10 |
| U.S.S.G. § 2A2.4(b)(1)(A) | physical contact | +3 |
| U.S.S.G. 3E1.1 | acceptance of responsibility | -2 |
| Total | | 10 |

PSR ¶¶ 33-43; ECF No. 17 ("Plea Agreement") at ¶ 5.A. With a criminal history category of I, his Guidelines sentencing range is 8-14 months. PSR ¶ 104; Plea Agreement at ¶ 5.E.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of the recommended term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Himber's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

12

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Himber joined a large mob of rioters who overwhelmed police officers and aggressively pushed their way through the Rotunda Doors and into the Capitol building. Celebrating his violent trespass, Himber took a selfie photograph inside the Capitol Rotunda while surrounded by officers, and later climbed on top of a law enforcement vehicle. And he showed a propensity for violence when he yelled at someone whom Himber seemed to suspect was a journalist that "you're not fucking safe." The nature and circumstances of Himber's offense were of the utmost seriousness, and fully support the government's recommended sentence of eight months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, and a $100 special assessment.

### B.  Himber's History and Characteristics

Himber has had persistent run-ins with the law, suggesting that his attack on the Capitol was not an aberration, but part of a larger pattern of disrespect for our laws and democratic institutions. In 2014, he was convicted for disturbing the peace. PSR ¶ 45. Four years later, in 2018, he was arrested for operating a law enforcement while impaired, among other offenses. *Id.* at ¶ 48. Two years after that, in 2020 he was arrested for failing to appear for an outstanding warrant. *Id.* at ¶ 50. That same year he was arrested, once again, for operating a law enforcement while intoxicated. *Id.* at ¶ 51. Although Himber has not incurred any criminal history points, his repeated violations support the government's recommended sentence in this case.

Two points are important here. *First*, while Himber is in the Sentencing Guideline's criminal history "Category I," his history is not like those of other Category I defendants who have had no prior run-ins with the law. The Sentencing Guidelines do not account for this distinction,

so it is appropriate to do so as part of the Section 3553(a) sentencing factors. *Second*, for many defendants without prior criminal histories who attacked the Capitol on January 6, 2021, the risk of recidivism is not the risk of a general proclivity to commit crimes, but rather the risk of future politically or ideologically motivated crimes. For Himber, the risk of recidivism is both. This distinction too is worth considering as part of the Section 3553(a) factors.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Himber's criminal conduct on January 6 was the epitome of disrespect for the law. As Judge Berman Jackson observed, "We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power." Hearing Tr. At 20, *United States v. Cronin*, 22-CR-233 (ABJ) (D.D.C. June 9, 2023).

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[2] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[2] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a term of incarceration. Himber showed a concerning disregard for the law by joining in several scrums that endangered police officers, by climbing on a law enforcement vehicle, and by threatening someone he suspected was a journalist. Moreover, beyond the bare fact of pleading guilty in this case, Himber has not yet shown any remorse for his conduct. His actions show that Himber quite simply did not believe or did not care that his behavior was dangerous or illegal.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision

leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[3]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[4] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Hess*, 23-CR-86 (RCL)—a case which, like Himber's, involved physical interference with police officers—the defendant entered the Capitol through the East Rotunda Doors, near where Himber pushed against the police. As police officers fired pepper balls and attempted to physically remove the rioters, Hess held his ground. Government Sentencing Memorandum at 3-6, *United States v. Hess*, 23-CR-86 (D.D.C. Feb. 12, 2024), ECF No. 37. The officers eventually removed Hess and the other rioters by pushing them back out the East Rotunda Doors. *Id.* But as an officer tried to close the doors, Hess moved to stop him. *Id.* The officer told Hess to "stop" multiple times, but Hess pushed the officer with his right arm while holding the

---

[3] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[4] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

door open with his left arm. *Id.* Eventually forced out of the building, Hess bragged about what happened on social media. *Id.* at 7. Judge Lamberth sentenced Hess to nine months' incarceration.

Unlike Hess, Himber did not push an officer. But Himber's conduct was in other ways more serious than Hess's. Himber was involved in several separate thrusts against police officers into the Capitol and its Rotunda. And unlike Hess, Himber showed continuing disrespect for the law by climbing on a law enforcement vehicle and threatening a presumed journalist.   Given the similarity of their conduct, Himber deserves a sentence similar to Hess's.

In *United States v. Yates*, 23-CR-372 (TNM), the defendant entered the Capitol through the Senate Wing Door and eventually made his way to the area outside the Rotunda Doors. Government Sentencing Memorandum at 3-8, *United States v. Yates*, 23-CR-372 (D.D.C. June 5, 2024), ECF No. 29. There, he joined the mob of rioters that included Himber, which pushed its way into the Rotunda. With Himber and others, Yates pushed against the line of officers to enter the Rotunda. Judge McFadden sentenced Yates to six months' incarceration. Yates spent more time in the Capitol (over an hour), but Himber was involved in multiple thrusts against officers, and later took a selfie, climbed on a law enforcement vehicle, and threatened an apparent journalist. Himber deserves a more substantial sentence.

Finally, in *United States v. Purkel*, 1:23-CR-448 (JEB), the defendants—a father and son—traveled with Himber himself to the Capitol and followed essentially the same route into the building. After trying to get into through the east side around 3:08 p.m., they were more successful around 3:21 p.m., eventually forcing their way into the Rotunda before being surrounded by the police. Like Himber, Willard Purkel (the father) climbed atop a law enforcement vehicle. And Willard Purkel briefly made contact with two police offices. But neither Willard Purkel nor his

son, Colby, threatened an apparent journalist, and both expressed sincere remorse for their actions, something that Himber has not done. Colby Purkel was sentenced to 21 days' incarceration, Himber to 60 days'. For his concerning threats, and for his lack of remorse, Himber deserves a more significant sentence.

## VII.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[5] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Himber must pay $2,000 in restitution, which reflects in part

---

[5] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

the role Himber played in the riot on January 6.[6] Plea Agreement at 8. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.* Himber's restitution payment must be made to the Architect of the Capitol. *See* PSR at ¶ 107.

## VIII.    FINE

Himber's convictions for violating 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Himber makes $91,500 annually, PSR ¶ 82, and has a net worth of $24,077. *Id.* at ¶ 93. Given this, Himber has the ability to pay a fine.

---

[6] Unlike under the Sentencing Guidelines for which the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

## X.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of eleven months' incarceration, 36 months' supervised release, 100 hours' community service, $2,000 in restitution, a $100 in special assessments, and a fine.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    /s/ Brendan Ballou
       Brendan Ballou
       Special Counsel
       DC Bar No. 241592
       United States Attorney's Office
       601 D Street NW
       Washington, DC 20001
       (202) 431-8493
       brendan.ballou-kelley@usdoj.gov

21